145 F.3d 5
 76 Fair Empl.Prac.Cas. (BNA) 1569,
73 Empl. Prac. Dec. P 45,393
Richard PROVENCHER, Plaintiff, Appellee,
v.
CVS PHARMACY, DIVISION OF MELVILLE CORPORATION, et al.,
Defendants, Appellants.
Richard PROVENCHER, Plaintiff, Appellant,
v.
CVS PHARMACY, DIVISION OF MELVILLE CORPORATION, et al.,
Defendants, Appellees.
 Nos. 97-1711, 97-1732.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 8, 1998.
Decided May 26, 1998.
 
 Mark G. Furey for CVS Pharmacy, et al.
 Andru H. Volinsky for Provencher.
 Before LYNCH, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.
 COFFIN, Senior Circuit Judge.
 
 
 1
 These appeals arise out of Richard Provencher's federal claims against CVS Pharmacy (CVS) of sexual harassment and retaliation and Deborah Banaian's state counterclaims for false arrest and imprisonment, intentional infliction of emotional distress, and defamation. A jury found CVS retaliated against Provencher for filing a sexual harassment claim, and declined to find defamation. CVS appeals the jury instruction on retaliation and the punitive damages award. Banaian appeals the dismissal of her first two counterclaims; in turn, Provencher appeals the dismissal of his sexual harassment claim. We affirm the district court in all respects.
 
 I. FACTUAL AND PROCEDURAL OVERVIEW
 
 2
 Provencher was employed by CVS from July 1988 until his termination in May 1995. He worked as Banaian's assistant manager from late 1989 until April 1992, when he was promoted to manager of another CVS store. At the time CVS fired him, he managed a CVS store in Manchester, New Hampshire.
 
 
 3
 The core of Provencher's case was that he was sexually harassed by Banaian because he was a gay man and ultimately fired by CVS because he reported the harassment. Provencher alleged that Randy Ellis, his supervisor in 1989, directed Banaian to harass him, with the goal of leading him to resign. Rather than quit, Proventure reported the harassment to company officials, who took no remedial action. In 1995 he filed a sexual harassment complaint with the New Hampshire Commission for Human Rights. Around that same period, he served on a jury, which he reflected on his CVS time sheet as a forty hour work week of jury service. Shortly thereafter, he was terminated by CVS, allegedly for falsifying payroll records during this period.[1] Provencher claimed, and the jury agreed, that he was discharged in retaliation for filing a sexual harassment claim.
 
 
 4
 The central tenets of the defense were: Ellis did not know Provencher was gay until late 1993 and therefore could not have acted as alleged; CVS did not pursue remedial action because Provencher specifically directed it not to do so; and, finally, Provencher was terminated for violating company policy. Banaian's counterclaims arise from her allegation that Provencher improperly had police remove her from the store he managed, thereby embarrassing and humiliating her in front of co-workers.
 
 
 5
 As no insufficiency of the evidence claim has been raised, we are not concerned with the adequacy of the jury's findings of fact, but rather with the legal decisions made by the judge. We address first CVS' contentions that the district court erred in the nature of the instructions given and the damages imposed. We then examine the dismissal of the counterclaims of intentional infliction of emotional distress and false arrest and imprisonment. Finally, we turn to Provencher's sexual harassment hostile work environment claim to review its dismissal on summary judgment.
 
 II. THE JURY INSTRUCTIONS
 
 6
 The parties agree that at all times during the litigation CVS maintained that Provencher was fired for falsifying payroll records, and Provencher alleged the termination amounted to retaliatory discharge. CVS argues on appeal that the jury could have found that both reasons contributed to the termination,[2] and it was error to use the language "played a part" and "a motivating factor" in the retaliation instruction. According to CVS, where a discriminatory motive can be one of multiple factors resulting in discharge, the jury should be instructed that liability attaches only where the impermissible motive is a "determination" "dominant" or "substantial" factor in the employer's decision.
 
 
 7
 Before examining the adequacy of the instruction, we consider whether, as Provencher claims, CVS failed to raise its challenge below. If it did not object, we review for plain error. See Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 767 (1st Cir.1996). Plain error applies only where the error results in a clear miscarriage of justice or seriously affects the fairness, integrity or public reputation of the proceedings. See id. The record shows that CVS objected generally to the instruction given, and specifically requested the court to describe the prohibited motivation as "substantial," "principal," "dominant," or some other language conveying that the jury could not find liability if the discriminatory motive was de minimus. While better practice would have been to object to the specific language it now contests-- "played a part" and "a motivating factor" --CVS' objection did go to the heart of its current argument, namely, that the jury might believe it could impose liability even where the discriminatory motive was small and the permissible motive large.
 
 
 8
 Finding therefore that CVS sufficiently raised the issue below, we examine the jury instructions de novo to determine if, taken as a whole, they confused or misled the jury on the applicable law. See Tatro v. Kervin, 41 F.3d 9, 13 (1st Cir.1994). We will not reverse a judgment if we determine that the instruction, examined in this light, is harmless. See Davet v. Maccarone, 973 F.2d 22, 26 (1st Cir.1992).
 
 
 9
 Because we must examine the jury instruction on retaliation as a whole, we repeat in full that portion concerning causation:
 
 
 10
 [U]nder Title VII, it is unlawful for an employer to discriminate against any employee because that employee has opposed what he or she believed to have been sex discrimination by an employer, or because the employee filed a charge of sex discrimination ....
 
 
 11
 ....
 
 
 12
 It is not necessary for Mr. Provencher to prove that a retaliatory motive was the sole motivation of, or even a primary motivation for, the defendant's decision to terminate him. The plaintiff need only prove that it played a part in the decision even though other factors may have motivated the defendant. Once Mr. Provencher shows that a retaliatory motive was a motivating factor in the defendant's decision, it is the defendant's burden to articulate a legitimate, nonretaliatory reason for its decision to terminate him. If the defendant does so, Mr. Provencher must prove by a preponderance of the evidence that the proffered legitimate reason is in fact a pretext and that retaliation was a motivating factor in the defendant's decision. Mr. Provencher retains the ultimate burden of persuading you by a preponderance of the evidence that he was retaliated against as he claims. Mr. Provencher claims that the defendant's reasons for terminating him are not the true reasons why he was terminated, that such reasons are unworthy of belief, and that the true reason for his termination was that he opposed an employment practice or practices he reasonably believed to have been sexually discriminatory, and/or that he filed a charge of employment discrimination with the commission. When you consider Mr. Provencher's evidence that the reason advanced by the defendant is a pretext, keep in mind that the relevant question is whether or not the defendant's reason was the real reason for its actions.... An employer is entitled to make an employment decision for a good reason, a bad reason, or for no reason at all, so long as the decision is not motivated by unlawful retaliation. However, you may consider whether the defendant's reason is merely a cover-up for unlawful retaliation.
 
 
 13
 In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and again in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (to which we refer generally as McDonnell Douglas/Burdine), the Supreme Court set forth the standard to be applied in cases where either a legitimate or an illegitimate motive applies. Although appellants argue for some adjusted standard, they offer no supporting authority for this proposition. As both parties consistently argued at trial that the jury had one of two factual versions to believe--fabrication violative of company policy or retaliation--we apply the McDonnell Douglas/Burdine standard to this case.
 
 
 14
 The plaintiff must first prove, by a preponderance of the evidence, a prima facie case of retaliation. See Burdine, 450 U.S. at 253, 101 S.Ct. 1089 (defining the standard in a sex discrimination case). If the plaintiff succeeds, the defendant has a burden of production to articulate a legitimate, non-discriminatory reason for its challenged actions. See id. at 254-55, 101 S.Ct. 1089. Then by a preponderance of the evidence, the plaintiff must show that the proffered reason is pretextual. See id. at 256, 101 S.Ct. 1089. At all times, however, the plaintiff retains the ultimate burden to show that he has been the victim of intentional discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting Burdine, 450 U.S. at 253, 101 S.Ct. 1089).
 
 
 15
 In this case, the district court accurately stated that, in order to impose liability, the jury had to find that the adverse action was taken because Provencher filed a sex discrimination charge. The court correctly defined that applicable standard of proof, explained that the jury must determine whether CVS' proffered reason was pretextual, and instructed that liability could be imposed if it determined that retaliation was the "real" and "true" reason for the employment decision.
 
 
 16
 The district court, however, also used the problematic language, "a motivating factor" and "played a part," instead of making it clear that liability should be imposed only if discrimination was the determinative factor. See Kelley v. Airborne Freight Corp., 140 F.3d 335, 348-49 (1st Cir.1998). But this is not dispositive. In Brown v. Trustees of Boston Univ., 891 F.2d 337, 353 (1st Cir.1989), the court upheld an instruction, given in a McDonnell Douglas/Burdine discrimination case, stating, amid otherwise appropriate language,
 
 
 17
 [The] universit[y] ha[s] the right to exercise independent judgment in choosing faculty and its decision must be respected unless tainted by ... illegal reasons cited by the plaintiff.... The university ... can make any kind of mistake except a decision that is tainted by sex discrimination or retaliation ... and your disagreement in general terms is not a basis for a finding for the plaintiff unless you find that the decision was effectively tainted by ... illegal considerations.
 
 
 18
 Acknowledging that "taint" indicated an incorrect standard, the court found that, given the instructions as a whole, its use did not confuse the jury. See id. at 354 (explaining, "[t]he 'taint' remarks were ... sandwiched between several statements which accurately defined the meaning of the words 'because of' ... and several statements that [the impermissible motive] must be the 'true' or 'real' reason for discrimination").
 
 
 19
 Similarly, the district court in this case instructed the jury to find the "true" or "real" reasons for the termination, and clearly placed the burden upon Provencher to prove that he was fired because he filed a sexual harassment claim. We think it clear to the jury, given the instructions as a whole and the argument at trial, that liability could exist only if the jury credited Provencher's position that retaliation was the reason behind his discharge, but not if retaliation was a mere factor among many.
 
 III. THE PUNITIVE DAMAGES AWARD
 
 20
 We review the district court's award of punitive damages de novo, as we review for legal error. See Compagnie De Reassurance D'Ile De France v. New England Reinsurance Corp., 57 F.3d 56, 71 (1st Cir. 1995). The jury awarded Provencher $8,000 in punitive damages for the retaliation, but awarded no compensatory damages.[3] Based on the jury's finding of liability, the district court awarded Provencher back pay of $8,423 for 1995 and $1,201 for 1996, with interest, and front pay of $141,221; it then entered judgment for these amounts and for $8,000 punitive damages in accordance with the jury's verdict.
 
 
 21
 CVS appeals the punitive damages award, relying on Kerr-Selgas v. American Airlines, Inc., 69 F.3d 1205 (1st Cir.1995). There, the plaintiff received compensatory damages on her state law claim but not on her federal claim, and was awarded punitive damages on the federal claim alone. See id. at 1214. We held that, under § 1981a, punitive damages could not be awarded in the absence of compensatory or nominal damages.[4] See id. at 1215.
 
 
 22
 This general proposition does not resolve the issue on appeal, however, because Kerr-Selgas is distinguishable from the present case on a critical fact--the award of back pay. The district court based its punitive damage award to Provencher on its concomitant award of back pay. By contrast, the punitive damages decision Kerr-Selgas did not rest in any way on the issuance of back pay or any remedy which was compensatory in function.[5] This is a decisive difference.
 
 
 23
 The Civil Rights Act of 1991 (the Act) made available compensatory and punitive damages in Title VII cases. See 42 U.S.C. § 1981a. The Supreme Court characterized this as a marked change in the conception of the injury redressable by Title VII. See United States v. Burke, 504 U.S. 229, 112 S.Ct. 1867, 1874 n.12, 119 L.Ed.2d 34 (1992). Subsection (b) of the Act provides that a punitive damages award is proper in a case where the plaintiff is injured and the discriminatory act is perpetrated with malice or reckless indifference.[6] The Act, however, does not limit an award of punitive damages to cases in which compensatory relief is given.
 
 
 24
 In Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1352 (7th Cir. 1995), the Seventh Circuit awarded the plaintiff punitive damages and back pay, in the absence of a compensatory damages award, reasoning that no federal law placed restrictions on such an award and common law restrictions were inapplicable. The Seventh Circuit first distinguished the different approaches to back pay under common law and under Title VII. Under common law, upon which Kerr-Selgas relied, punitive damages are prohibited in the absence of compensatory damages, but the latter include back pay. See id. By contrast, compensatory damages under § 1981a omit back pay. See id. This omission occurred to prevent double recovery, as Title VII already provided for back pay; the exclusion was not the result of viewing a back pay award as fundamentally distinct from compensatory damages. See id. (citing Landgraf v. USI Film Prod., 511 U.S. 244, 253, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). The Seventh Circuit then considered the essential nature of back pay. Traditionally viewed as an equitable remedy imposed by the judge, back pay reflects an injury of lost wages to the plaintiff. See Landgraf, 511 U.S. at 252-53, 114 S.Ct. 1483. As such, it is a " 'make-whole' remedy that resembles compensatory damages in some respects" and id "the most obvious economic damage in a wrongful discharge case." Id. (citations omitted). The Seventh Circuit concluded that, because Title VII placed no prohibition upon punitive damages in the absence of compensatory damages,[7] and because, in redressing an injury suffered by the plaintiff, back pay awards serve a similar purpose as compensatory damages awards, a punitive damages award was proper. See Hennessy, 69 F.3d at 1352. We agree with the Seventh Circuit's thoughtful analysis.
 
 
 25
 Here, too, the district court's award to Provencher of back pay was based on injury he suffered as a result of retaliatory discharge by CVS. We see no reason to allow punitive damages only where the jury enters an award for compensatory damages and not where the judge enters an award for back pay, given that injury to the plaintiff is redressed in both instances. We therefore uphold the punitive damages award.
 
 IV. THE COUNTERCLAIMS
 
 26
 In order to review adequately the dismissal of the false arrest and imprisonment, and the intentional infliction of emotional distress claims, we review briefly the evidence presented by Banaian. In 1994 and 1995, Banaian shopped on occasion at the Manchester CVS store managed by Provencher because it was close to her house. On March 12, 1995, she was shopping there, without addressing or looking at Provencher, when he swore at her, refused to allow her to retrieve her prescription, and then called the police to remove her from the store. Two officers arrived and when Provencher (incorrectly) told them that Banaian was barred from his store, they asked her to leave, which she did after deciding that any resistance would be futile. On the basis of this incident, she brought claims of false arrest and imprisonment, defamation and intentional infliction of emotional distress against Provencher. At the close of the case, the district court dismissed the false arrest and imprisonment claim, and directed Banaian to elect between her intentional infliction of emotional distress and defamation claims, allowing her to precede upon only one of these theories. Banaian now appeals the forced election and consequent dismissal of the intentional infliction of emotional distress claim and the dismissal of the false arrest and imprisonment claim.
 
 
 27
 False imprisonment, also referred to as false arrest under New Hampshire law, Hickox v. J.B. Morin Agency, Inc., 110 N.H. 438, 441, 272 A.2d 321, 323 (1970), is defined as "the knowing confinement of another unlawfully ... so as to interfere substantially with his physical movement." State v. Fecteau, 121 N.H. 1003, 1007, 437 A2d 294, 296 (1981) (citations omitted). Banaian concedes that the police simply asked her to leave, without threatening arrest, and she complied, without any verbal or physical resistance. We therefore agree with the district court that Banaian presented insufficient evidence of unlawful restraint to proceed on her false arrest and imprisonment claim.
 
 
 28
 In addition, we find that the intentional infliction of emotional distress claim, set forth in the counterclaim as resting upon statements supporting defamation and "conduct ... in falsely arresting and imprisoning" Banaian, properly did not proceed before the jury. In the absence of the dismissed false arrest and imprisonment claim, the remaining allegations were identical to those supporting defamation. As such, the standard articulated in DeMeo v. Goodall, 640 F. Supp. 1115, 1116 (D.N.H. 1986), applies, namely, "New Hampshire law does not recognize a cause of action for wrongful infliction of emotional distress where the factual predicate sounds in defamation."V. THE SEXUAL HARASSMENT CLAIM
 
 
 29
 Provencher's claim of sexual harassment was premised on a hostile work environment theory covering his employment as Banaian's assistant manager, her contact with him after he became manager of other CVS branches, and CVS' failure to address his sexual harassment complaints. At the close of plaintiff's case, the district court granted defendant's motion for judgment as a matter of law, dismissing the claim on statute of limitations grounds and rejecting Provencher's argument that otherwise time-barred acts were rendered timely under a continuing violation theory of sexual harassment. We review this decision de novo. See Schultz v. Rhode Island Hosp. Trust Nat. Bank, N.A., 94 F.3d 721, 726 (1st Cir.1996). We will reverse if we determine that a reasonable jury could have found in his favor. See id.
 
 
 30
 Sexual harassment is a form of gender discrimination prohibited by Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(a)(1) (prohibiting an employer from failing or refusing to hire, discharging, or otherwise discriminating against any individual on compensation, terms, conditions, or privileges of employment, because of the employee's sex); see Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (holding that a claim of hostile work environment sexual harassment is a form of sexual discrimination actionable under Title VII). A plaintiff can prevail on a hostile work environment sexual harassment claim only if he establishes that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create a hostile work environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
 
 
 31
 To assess the dismissal of Provencher's hostile work environment claim, we review briefly his evidence of sexual harassment. In 1989, his district manager suggested he receive counseling for his homosexuality and then transferred him to work as Banaian's assistant manager; from this time until April 1992, Banaian called him "fag" and "queer," said she would make him "a real man," fondled herself and disrobed in his presence, and touched his genital area, among other inappropriate conduct. Also during this period, he was denied a pay raise. Sometime in late 1992 or early 1993, after he no longer worked for Banaian, she telephoned him, saying that she missed him and had no one with whom she could play or "change clothes." In late 1993, he took a stress-related leave of absence, resulting in large part from Banaian's conduct. In 1994, Banaian began shopping at the Manchester store he managed, and toward the end of the year, came in often, on occasion up to three times a day.[8] In March 1995, Provencher received a telephone call at work from someone he suspected to be Banaian's husband, threatening to spill his "AIDS blood" all over the parking lot. Two days later, Banaian came to his store and, after she refused to leave, he called the police, who escorted her from the store. Finally, over the course of his employment with CVS and as early as 1992, Provencher reported the conduct of Banaian and Ellis to appropriate CVS personnel, but the company did not investigate and took no remedial action. These facts, taken together, form the basis of Provencher's claim that he was subjected to a hostile work environment.
 
 
 32
 Title VII requires that an employment discrimination charge that is first filed with the appropriate state agency, as here, be filed with the Equal Employment Opportunity Commission within 300 days of the alleged discrimination. See 42 U.S.C. § 2000e-5(e). The parties agree that, because Provencher did not file until January 11, 1995, acts pre-dating March 18, 1994, are outside the standard statute of limitations period. Provencher argues, however, that he may reach back to include these otherwise untimely acts in his charge because he was subjected to a "continuing violation" of sexual harassment.
 
 
 33
 The continuing violation doctrine creates an equitable exception to the 300-day limitation when the unlawful behavior is deemed ongoing. See, e.g., Lawton v. State Mut. Life Assurance Co. of Am., 101 F.3d 218, 221 (1st Cir. 1996); Sabree v. United Bhd. of Carpenters and Joiners Local No. 33, 921 F.2d 396, 400-02 (1st Cir. 1990); Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990). A continuing violation allows a plaintiff not only to allege otherwise time-barred acts, but more concretely, to receive damages, such as back pay, based on and reaching back to those acts. See DeNovellis v. Shalala, 124 F.3d 298, 307-08 (1st Cir. 1997) (citations omitted).
 
 
 34
 Continuing violations may be serial or systemic. See Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 869 (1st Cir. 1997). Provencher argues that his claim could fall in either category. We think not. "A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint." Sabree, 921 F.2d at 400 n.7 (citing Jensen, 912 F.2d at 523). This type of claim requires no identifiable act of discrimination in the limitations period, Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994), and refers to general practices or policies, such as hiring, promotion, training and compensation. See, e.g., Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 183 (1st Cir. 1989) (alleging a discriminatory promotional system); Rich v. Martin Marietta Corp., 522 F.2d 333, 348 (10th Cir.1975) (entire promotional system challenged as resulting in plaintiffs' staying in lower echelons interminably); Barbara Lindemann & Paul Grossman, Employment Discrimination Law 1355-59 (3d ed. 1996).
 
 
 35
 In Muniz-Cabrero, we found that the plaintiff's systemic continuing violation § 1983 claim for discrimination based on political affiliation failed because the plaintiff did not produce comparative evidence indicating that he was treated differently from persons in other political groups. 23 F.3d at 611. As in Muniz-Cabrero, Provencher's claim essentially centers on CVS' discriminatory behavior toward him, with no comparative evidence of a policy or practice by CVS that results in discrimination against gay men generally. Because evidence of verbal and physical harassment, overall decreased salary, and the company's failure to remedy indicate acts intended to harm and humiliate Provencher only, and do not show a policy or practice by the company, see id., his claim is most appropriately framed as a serial violation.
 
 
 36
 A serial violation occurs where a chain of similar discriminatory acts emanating from the same discriminatory animus exists and where there has been some violation within the statute of limitations period that anchors the earlier claims. See DeNovellis, 124 F.3d at 307. Discrimination cases may involve acts that amount to unlawful discrimination upon their repetition or escalation. See, e.g., Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1166 (7th Cir.1996) ("In its early stages [acts] may not be diagnosable as sex discrimination ..., or may not cause sufficient distress ..., or may not have gone on long enough to charge the employer with knowledge and a negligent failure to take effective remedial measures."). It therefore makes most sense to view the anchor violation requirement as demanding that the plaintiff prove a timely act forming part of and exposing a pattern of actionable sexual harassment. Merely residual effects of past discriminatory conduct, however, are not themselves acts of discrimination and therefore will not satisfy the anchor violation requirement. See DeNovellis, 124 F.3d at 309.
 
 
 37
 Even where a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place. See Sabree, 921 F.2d at 401-02. We begin our analysis here, as Provencher has failed to meet this critical notice standard.
 
 
 38
 In Sabree, we rejected the plaintiff's continuing violation claim because the plaintiff admitted that he believed, at every turn, that he was being discriminated against. We reasoned that a knowing plaintiff has an obligation to file promptly or lose his claim: "[t]his can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." Id.; see also Jensen, 912 F.2d at 522 ("What matters is whether, when and to what extent the plaintiff was on inquiry notice."); Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481-82 (3d Cir.1997) (failure to claim sexual harassment earlier does not destroy the plaintiff's continuing violation claim because the evidence shows that the harassment intensified and plaintiff did not realize until later the severity of the sexual harassment).
 
 
 39
 This revelatory standard reflects the rationale of the continuing violation doctrine. "[T]he purpose ... is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." Speer v. Rand McNally & Co., 123 F.3d 658, 663 (7th Cir.1997) (quoting Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 446 (7th Cir.1994)); see also Galloway, 78 F.3d at 1166 (plaintiffs must be encouraged to commence litigation when they become aware of conduct that would support a viable claim without forcing them to do so prematurely); West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir.1995) (explaining that exceptions to the standard filing time serve to accommodate indeterminate situations that cannot be measured in full as they occur). As Provencher admits that he knew he was being harassed long before he brought his sexual harassment suit, and certainly had this knowledge before the statute of limitations period had run, his continuing violation claim cannot stand.
 
 
 40
 It also fails because Provencher has not demonstrated that the timely acts are linked to the untimely acts by similarity, repetition or continuity. See Galloway, 78 F.3d at 1166 ("Acts of sexual harassment so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations.") Where these characteristics are not met, the alleged anchor violation cannot serve as a "continuation" of the past allegedly discriminatory behavior. See, e.g., Lawton, 101 F.3d at 221 (firing insufficient to meet timely violation requirement of a serial continuing violation, as "[c]ommon sense teaches that a plaintiff cannot resuscitate time-barred acts, said to be discriminatory, by the simple expedient of linking them to a non-identical, non-discriminatory, non-time-barred act"); Kassaye v. Bryant College, 999 F.2d 603, 607 (1st Cir.1993) (the sole timely act, a request that plaintiff vacate his office after his contract expired, was not unreasonable on its face given the need to accommodate other faculty members, and it amounted to a mere effect of alleged past discrimination, namely denial of tenure); Purrington v. University of Utah, 996 F.2d 1025, 1028 (10th Cir.1993) (plaintiff's observance of one act of sexual harassment and hearing about another such incident one year after the alleged harassment she personally experienced had ceased were incidents too sporadic and removed from the plaintiff's workplace to support a continuing violation claim).
 
 
 41
 The untimely acts alleged during Provencher's tenure as Banaian's assistant manager (ending in April 1992) are extreme in character, ranging from name calling to physical invasion, and the other untimely act alleged involved a phone call in which Banaian told Provencher she missed him and had no one with whom to change clothes. By contrast, the timely acts involve apparently neutral behavior (shopping at his store, without inappropriate comment or movement), failure to remediate by the company, and a bare, unsupported suspicion (the telephone call he believes was made by Banaian's husband). The timely allegations therefore are too separated by character and time to be viewed as a repetition of the untimely acts.
 
 
 42
 We are left with determining whether the timely allegations by themselves support a claim for sexual harassment. We find they do not. Failure by CVS to remediate did not exacerbate the harassment and, although it constitutes improper behavior that could subject the company to liability, it is not itself sexual harassment. See Speer, 123 F.3d at 664 (an employer's refusal to take action is not itself an act of Title VII discrimination); Burrell v. City Univ. of New York, 1998 WL 89661, * 7 (S.D.N.Y. Feb.26, 1998) (employer's failure to remedy harassment goes to establish its liability, but not to establish actionable sexual harassment). Overall reduced pay is an effect of past discrimination and not itself a discriminatory act. See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir.1997). The telephone call, by itself and without supporting evidence linking it to Banaian, is insufficient. And, while context is relevant to determining hostile work environment claims, we certainly cannot say that shopping at a store, without more, is a ground upon which a sexual harassment claim may rest. "We accept that many different forms of offensive behavior may be included within the definition of hostile environment sexual harassment.... However, the overtones of such behavior must be, at the very least, sex-based, so as to be a recognizable form of sexual harassment." Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 441 (1st Cir.1997). Provencher's evidence fails to meet this threshold.
 
 VI. CONCLUSION
 
 43
 For the reasons stated above, we affirm the district court in all respects.
 
 
 44
 Affirmed.
 
 
 
 [1]
 Although a salaried employee, Provencher regularly recorded his hours for CVS. He testified that his supervisor instructed him, contrary to company policy, while on jury service, to enter pay records reflecting his normal work week of 45 hours as being spent entirely in jury service, i.e., to be recorded as "benefit" hours. In fact, Provencher's actual time spent on jury duty was considerably less than 45 hours during each of his three weeks of service. Although, as averred by Provencher, he was simply following instructions, CVS fired him for falsifying his payroll reports
 
 
 [2]
 CVS describes this as a "mixed motive" case, but clarifies in its reply brief that it does not argue that the jury therefore should have received instruction consistent with Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (where the plaintiff proves that discrimination was a motive in the adverse employment action, the employer will not be liable if it can show the same decision would have been made even in the absence of an unlawful motive). "Mixed motive" has become a term of art in employment discrimination law and CVS' attempt to use the phrase out of context is not helpful
 
 
 [3]
 The verdict form specifically directed the jury to award the appropriate amount of damages for emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment, and necessary counseling, resulting from CVS' retaliation. The jury found no such damages
 
 
 [4]
 We also determined that, although nominal damages are recoverable in intentional discrimination cases under 42 U.S.C. § 1981a(a)(1), a liability verdict does not compel such an award absent a timely request. Kerr-Selgas, 69 F.3d at 1215. Where, as here, no such request was made, and the district court did not impose nominal damages, such damages cannot support the punitive damages award
 
 
 [5]
 In its post-trial order, the district court stated,
 CVS has offered no authority to support its assertion that punitive damages are not available merely because the court, and not the jury, is responsible for determining whether a back pay award ... or a front pay award is warranted. Since the court awarded the plaintiff $9,624 in back pay, plus interest, as well as $141,221 in front pay, CVS' motion to vacate the punitive damages award is denied.
 
 
 [6]
 Title 42, U.S.C. § 1981a(b) provides in pertinent part:
 A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
 
 
 [7]
 The Hennessy court intimated that the punitive damage award might survive even without the back pay award, as nothing in the plain language of 42 U.S.C. § 1981a(b) conditions an award of punitive damages on an underlying award of compensatory damages. 69 F.3d at 1352. See also Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008 (7th Cir.1998) (upholding a punitive damages award in a sex discrimination suit where no compensatory damages or back pay was awarded). Since back pay was awarded in this case, however, we need not reach this question
 
 
 [8]
 Although in his appellate brief Provencher states that Banaian also winked at him during one of these visits, the citation provided in the brief is to statements made by his counsel, not to evidence presented at trial, and we can find no supporting evidence in the record